Filed 8/14/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| JACKPOT HARVESTING COMPANY, INC.,<br><br>      Petitioner,<br><br>           v.<br><br>THE SUPERIOR COURT OF MONTEREY COUNTY,<br><br>      Respondent;<br><br>JOSE ROBERTO LAINEZ et al.,<br><br>      Real Parties in Interest. | No. H044764<br>(Monterey County<br>Super. Ct. No. 15CV000491 |

Labor Code section 226.2,[1] which became effective January 1, 2016, addresses the manner in which piece-rate employees are to be compensated for rest and recovery periods and other nonproductive time on the job (collectively, rest/NP time). Subdivision (b) of the statute (hereafter section 226.2(b)) provides a safe harbor for an employer that, prior to 2016, failed to properly compensate its piece-rate workers for rest/NP time.[2] Under section 226.2(b), an employer that pays its employees for

---

[1] All statutory references are to the Labor Code unless otherwise specified.

[2] In this case, we refer to section 226.2(b) as a "safe harbor" provision insofar as it affords an employer an affirmative defense to certain claims by piece-rate workers for unpaid rest/NP time when the employer complies with a number of specified conditions. In so doing, we acknowledge that a "safe harbor" statutory provision takes a number of different forms and therefore has various meanings. (See, e.g., *Optimal Markets, Inc. v. Salant* (2013) 221 Cal.App.4th 912, 920 [Code Civ. Proc., 128.7 provides party a 30-day

previously unpaid rest/NP time accrued between July 1, 2012 and December 31, 2015, is entitled to assert "an affirmative defense to any claim or cause of action . . . based solely on the employer's failure to timely pay the employee the compensation due for [rest/NP time] . . . for time periods prior to and including December 31, 2015."

This lawsuit concerns whether an employer complying with the requirements of section 226.2(b) has a safe harbor against any employee claims for rest/NP time accruing prior to and including December 31, 2015, or has an affirmative defense only to those claims accruing between July 1, 2012 and December 31, 2015. We will conclude that under the plain and unambiguous language of section 226.2(b), an employer complying with the statute has an affirmative defense against any employee claims for rest/NP time accruing prior to and including December 31, 2015.

## I. INTRODUCTION

Employers in California—and, specifically, agricultural employers—are required to "authorize and permit all employees to take rest periods." (Cal. Code Regs. tit. 8, § 11140, subd. 12.) Agricultural employees working outdoors in temperatures exceeding 95 degrees Fahrenheit are entitled to a specified recovery period. (Cal. Code Regs. tit. 8, § 3395, subd. (e)(6) [minimum 10-minute recovery period every two hours].) Under California law, mandated rest and recovery periods "shall be counted as hours worked, for which there shall be no deduction from wages." (§ 226.7, subd. (d); see *id.*, subd. (c) [providing for penalties for an employer's failure to provide mandated rest or recovery periods].) Further, where an employee's work hours are separately classified by the employer as productive (directly compensated) or nonproductive (not compensated), an employer must still pay the employee for all hours worked; an employer may not simply

---

safe harbor to avoid sanctions by withdrawing improper pleading]; *Bourgi v. West Covina Motors, Inc.* (2008) 166 Cal.App.4th 1649, 1660 [safe harbor provisions under Veh. Code, §§ 9990, 9991, for benefit of automobile dealers concerning minor repair damage to vehicles].)

2

divide the total hours worked into the amount the employee was paid for productive time to arrive at an average hourly wage.  (*Armenta v. Osmose, Inc.* (2005) 135 Cal.App.4th 314, 324 (*Armenta*).)

Appellate courts in two 2013 decisions—*Gonzalez v. Downtown LA Motors, LP* (2013) 215 Cal.App.4th 36 (*Gonzalez*) and *Bluford v. Safeway Stores, Inc.* (2013) 216 Cal.App.4th 864 (*Bluford*)—clarified that the principles that nonproductive time and rest/recovery time are separately compensable apply to workers who are paid on a piece-rate basis, i.e., workers compensated based upon the type and number of tasks performed rather than the number of hours worked.  The California Legislature thereafter, through Assembly Bill 1513 (AB 1513), enacted section 226.2, which codified the *Gonzalez/Bluford* decisions and provided a mechanism for compensating piece-rate workers for previously unpaid accrued rest/NP time.  (Stats. 2015, ch. 754, § 4, p. 5609.)

Real party in interest Jose Roberto Lainez (Lainez) filed suit on May 14, 2015, against his former employer, petitioner Jackpot Harvesting Company, Inc. (Jackpot), a company that performs harvesting and farming activities in Monterey County and Ventura County.  Lainez alleged that he had worked for Jackpot as an agricultural worker and was compensated on a piece-rate basis.  He alleged six causes of action for himself and on behalf of all members similarly situated.  Only the first cause of action—asserting claims for unpaid minimum wages for rest/NP time, as well as interest, liquidated damages, and statutory penalties—is at issue here.

On January 1, 2016, approximately six months after Lainez filed the class action complaint, section 226.2 went into effect.  Under section 226.2(b), an employer complying with the statute's requirements, including payment (by December 15, 2016) of all amounts due to employees for uncompensated rest/NP time for the period of July 1, 2012 to December 31, 2015, may assert an affirmative defense to an employee's "claim or cause of action" arising out of such uncompensated rest/NP time "for time periods prior to and including December 31, 2015."  (§ 226.2(b).)

3

In March 2016, Jackpot filed a first amended answer to the Lainez complaint, alleging its compliance with section 226.2(b) as a 37th affirmative defense. Jackpot later moved for summary adjudication, contending that because it had complied with all of the safe harbor requirements by making back payments to Lainez and other Jackpot employees—a total of 1,138 current and former employees—the 37th affirmative defense was an absolute bar to the first cause of action of the complaint. Lainez opposed the motion, but he admitted that Jackpot had complied fully with section 226.2(b).

The superior court denied the motion, concluding that the language of the statute was unclear and that, while section 226.2(b) provided a safe harbor to employers against claims by piece-rate workers for unpaid rest/NP time accruing between July 1, 2012 and December 31, 2015, it did not provide a defense for such claims accruing prior to July 1, 2012.

Jackpot challenges that order by this petition for writ of mandate. Jackpot contends that under the plain language of the statute, if an employer complies with the requirements of section 226.2(b), it has a safe harbor defense to *all* employee claims for unpaid rest/NP time accruing on or prior to December 31, 2015. Jackpot argues alternatively that even if the language of section 226.2(b) is unclear, applying all rules of statutory interpretation, including consideration of legislative history, the intent of the Legislature was to provide employers that complied with section 226.2(b) a complete defense to all such claims for unpaid rest/NP time accruing on or prior to December 31, 2015. Jackpot urges that writ relief is appropriate to address the claimed error because, inter alia, the trial court's ruling "has far-reaching consequences for similarly situated California employers" that, like Jackpot, elected under the safe harbor

4

provision to make back payments to their piece-rate employees. Jackpot claims that over 2,300 private companies made such an election.[3]

The parties have cited no published cases interpreting the safe harbor provisions of section 226.2(b). After our careful reading of the statute and our application of established rules of statutory interpretation, we conclude that the unambiguous language of section 226.2(b) provides the employer a safe harbor for all employee claims for unpaid rest/NP time accruing on or prior to December 31, 2015, where the employer has complied with all the requirements of the statute, including timely paying employees for such claims that had accrued between July 1, 2012 and December 31, 2015. We conclude that the court erred in denying Jackpot's motion for summary adjudication. We will therefore grant the petition for writ of mandate and will direct respondent superior court to enter an order granting Jackpot's motion for summary adjudication of the first cause of action of the complaint.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    Pleadings

Lainez filed his class action complaint on May 14, 2015, alleging six causes of action. In the first cause of action of his complaint, Lainez alleged that he, along with members of his purported class, were piece-rate agricultural workers employed by Jackpot. (See Cal. Code Regs, tit. 8, § 11140, subd. 2(L) [defining piece-rate compensation for agricultural workers as "a method of payment based on units of

---

[3] In support of this assertion, Jackpot cited a Department of Industrial Relations website. (See <https://www.dir.ca.gov/pieceratebackpayelection/ pieceratelisting.asp> (as of Aug. 14, 2018).) We take judicial notice of this website (see Evid. Code, §§ 452, 459; *Moehring v. Thomas* (2005) 126 Cal.App.4th 1515, 1523 & fn. 4 [judicial notice taken of United States Census Bureau's website containing 2000 U.S. Decennial Census]), in which the Department of Industrial Relations listed a total of more than 2,100 employers that had filed elections to make back payments to piece-rate employees under the safe harbor provision of section 226.2(b).

production or a fraction thereof"].)  Their jobs required them to (1) perform a minimum of 10 minutes of mandatory exercise in the morning, (2) attend meetings of approximately 15 minutes in duration, (3) make trips between fields two to three times per month with an average duration of 30 minutes, and (4) take 15-minute rest breaks. Jackpot's workers were compensated only on a piece-rate basis, and they were not separately paid for this nonproductive time and rest time at a rate equal to or greater than minimum wage.  Citing various provisions of the Labor Code,[4] Lainez asserted on behalf of himself and similarly situated Jackpot workers a claim for damages, liquidated damages, interest, and fees.

The remaining five causes of action of the complaint are not at issue in this petition for writ of mandamus challenging the trial court's denial of Jackpot's summary adjudication motion.

Jackpot filed its answer on July 13, 2015.  Jackpot thereafter filed a first amended answer to the complaint, alleging as a 37th affirmative defense that it intended to avail itself of certain provisions of section 226.2, subdivisions (b) and (d).

## B.    Motion for Summary Adjudication

On February 3, 2017, Jackpot filed a motion for summary adjudication asserting that the first cause of action of the complaint was without merit and the 37th affirmative defense of the amended answer to the complaint had been established.  Jackpot presented evidence of 12 claimed undisputed material facts relating to its assertion that it had complied fully with the safe harbor provisions of section 226.2(b).

---

[4] Lainez cited the following Labor Code sections in support of his first cause of action:  sections 558 (liability for civil penalties for violating wage and hour laws); 1194 (recovery of minimum wages plus interest, reasonable attorney fees, and costs); 1194.2 (liquidated damages based upon failure to pay minimum wages); 1197 (unlawful to pay less than minimum wage); and 1198 (unlawful to require employee to work a greater number of hours than maximum hours fixed by law).  Lainez also cited "Wage Orders 13 and/or 14" in support of the first cause of action.

The 12 undisputed material facts stated in the motion were that (1) Jackpot had employed Lainez until his termination in or about December 2015 on its celery harvesting crew, and he was compensated on a piece-rate basis; (2) Jackpot had filed on June 23, 2016, the requisite notice with the Department of Industrial Relations (DIR) that Jackpot elected to make back payments to its piece-rate employees under section 226.2(b)(3) and subdivision (c); (3) Jackpot had elected to use the formula identified in section 226.2(b)(1)(B) (i.e., "4% of gross earnings") for calculating and making back payments to current and former employees for previously uncompensated rest/NP time from July 1, 2012 to December 31, 2015; (4) Jackpot had engaged Charles Doglione, a certified public accountant and business consultant, to obtain payroll data necessary to make the calculations for back payments to current and former employees; (5) Jackpot had retained Simpluris, a national class action settlement administrator, to locate and provide payments to all current and former affected workers; (6) Jackpot had determined that there were 1,138 current and former employees who had been paid by Jackpot on a piece-rate basis between July 1, 2012 and December 31, 2015; (7) Doglione had provided to Simpluris the employee information and calculations for each affected employee to be compensated, and he wired Simpluris the funds necessary to make the payments and required payroll and other taxes; (8) Simpluris had located and confirmed the mailing address for each affected employee; (9) Simpluris had sent on November 18, 2016, checks for uncompensated or undercompensated rest/NP time accrued for the period of July 1, 2012 to December 31, 2015, to all workers who had been located, as well as explanatory statements and spreadsheets to those workers; (10) Simpluris had sent by overnight delivery on December 14, 2016, a statement to the DIR concerning amounts calculated as due to affected workers who could not be located, along with a single check for the total amount due to this group of affected workers, a second check for the administrative fee due under section 226.2, subdivision (d)(1), and a statement detailing for each affected employee his or her name, last known address,

7

social security number, and amount payable; (11) Jackpot had preserved the records showing hours worked, calculation of hours worked, and payments made to employees and the Labor Commissioner; and (12) Jackpot stated that if any affected employee who did not receive his or her check inquired of Jackpot, it would advise the employee to contact Simpluris, who would then direct the person to the DIR. Jackpot argued therefore that, under section 226.2(b), it had established as a matter of law a complete defense to the first cause of action.

Lainez opposed the motion. He declared that he had begun working for Jackpot prior to May 14, 2011, and that he was seeking compensation in the first cause of action for unpaid minimum wages prior to July 1, 2012. Lainez in his opposition agreed that each of the material facts identified in Jackpot's summary adjudication motion was undisputed. But Lainez argued that the safe harbor provision of section 226.2(b) did not offer a complete defense to Jackpot because the statute did not immunize the company against unpaid minimum wage claims accruing prior to July 1, 2012.

After hearing argument, the court denied the motion for summary adjudication. In its formal order filed May 17, 2017, the court reasoned "that the express language in Labor Code Section 226.2 is not clear and . . . while the [L]egislature intended the 'safe harbor' defense to eliminate an employer's liability for penalties and other consequential damages arising from the failure to compensate piece rate workers for rest periods and other non-productive time during the 'safe harbor' period of July 1, 2012 to December 31. 2015, the [L]egislature did not intend to deprive piece[-]rate workers of their rights to receive compensation for rest periods and other non-productive time for time periods prior to July 1, 2012."

Jackpot filed a petition for writ of mandate and a request for temporary stay with this court. We granted a temporary stay of all trial court proceedings to permit further consideration of the issues raised in the petition. In the same order, we directed respondent superior court to show cause why a peremptory writ of mandate should not

8

issue as requested in the petition. Real party in interest Lainez filed an answer and opposition to the petition, and Jackpot filed a formal reply.

## III. DISCUSSION

### A. Parties' Contentions

Jackpot argues there was no dispute below that it had complied with all requirements of section 226.2(b) to assert the safe harbor defense. It contends the language of the statute clearly provides that if, on or before December 15, 2016, the employer pays its piece-rate employees prior amounts due for unpaid rest/NP time for July 1, 2012 through December 31, 2015, and otherwise complies with the statute, it will have a defense for "any claim or cause of action . . . for time periods prior to and including December 31, 2015." (§ 226.2(b).) Jackpot argues that since the Legislature chose not to provide a specific date earlier than December 31, 2015, to limit the scope of the defense, the court erred in construing section 226.2(b) as providing a safe harbor only for claims accruing between July 1, 2012 and December 31, 2015.

Jackpot asserts further that the legislative history demonstrates that section 226.2(b) was intended to provide the employer a defense for all claims accruing on or prior to December 31, 2015. Jackpot cites both material it presented below in its reply to Lainez's opposition to the motion and evidence it discovered after the court's ruling that it presented below in a motion for reconsideration of the denial of summary adjudication.

Lainez responds that the language of the statute is ambiguous and that the phrase "for time periods prior to and including December 31, 2015" (§ 226.2(b)) is reasonably susceptible of multiple interpretations, including the one adopted by the court below. He contends the construction advanced by Jackpot that "would allow an employer to negate any liability for minimum wages earned by piece[-]rate workers prior to July 1, 2012" would constitute "[d]ivesting piece[-]rate workers of earned wages [which] is an absurd result that must be avoided." And Lainez asserts that interpreting section 226.2(b) as

9

urged by Jackpot would mean the divestiture of workers' vested property rights (i.e., earned wages) in violation of the takings clause of the Fifth Amendment of the United States Constitution.

Before addressing the merits of Jackpot's position, we will (1) describe familiar rules of statutory interpretation, (2) identify our standard of review, (3) provide some background concerning the enactment of AB 1513, and (4) discuss the relevant provisions of section 226.2.

## B.     Rules of Statutory Interpretation

Our interpretation of section 226.2 "is an issue of law, which we review de novo. [Citation.]" (*United Riggers & Erectors, Inc. v. Coast Iron & Steel Co.* (2018) 4 Cal.5th 1082, 1089 (*United Riggers & Erectors*).)

Our essential task in interpreting a statute " 'is to determine the Legislature's intent so as to effectuate the law's purpose.  We first examine the statutory language, giving it a plain and commonsense meaning.  We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment.  If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend.  If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.' [Citation.]  'Furthermore, we consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose.'  [Citation.]" (*Sierra Club v. Superior Court* (2013) 57 Cal.4th 157, 165-166.)

California courts follow an approach to determine legislative intent that involves up to three steps.  (*Alejo v. Torlakson* (2013) 212 Cal.App.4th 768, 786-787.)  The first step is our "examin[ation] of the actual language of the statute.  [Citations.]"  (*Halbert's*

*Lumber, Inc. v. Lucky Stores, Inc.* (1992) 6 Cal.App.4th 1233, 1238 (*Halbert's Lumber*).) We do so " 'because the statutory language is generally the most reliable indicator of legislative intent.' [Citation.]" (*Klein v. United States of America* (2010) 50 Cal.4th 68, 77.) In this first step, we scrutinize "words themselves, giving them their 'usual and ordinary meanings' and construing them in context. [Citation.]" (*People v. Lawrence* (2000) 24 Cal.4th 219, 230.) And we "will apply common sense to the language at hand and interpret the statute to make it workable and reasonable. [Citation.]" (*Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1122 (*Wasatch Property Management*).) In doing so, if we find the statutory language to be "clear, its plain meaning should be followed. [Citation.]" (*Great Lakes Properties, Inc. v. City of El Segundo* (1977) 19 Cal.3d 152, 155.) Thus, if there is no ambiguity, "we presume the Legislature meant what it said, and the plain meaning of the language governs. [Citations.]' " (*People v. Montes* (2003) 31 Cal.4th 350, 356.)

If we determine the statutory language is unclear, we will proceed to the second step and review the legislative history. (*In re York* (1995) 9 Cal.4th 1133, 1142; *Halbert's Lumber, supra*, 6 Cal.App.4th at p. 1239.) In doing so, we "examine the legislative history and statutory context of the act under scrutiny." (*Sand v. Superior Court* (1983) 34 Cal.3d 567, 570.) Under these circumstances, we "select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." (*People v. Jenkins* (1995) 10 Cal.4th 234, 246.)

In the event the proper interpretation of the statute is not evident after examining the legislative history, "we must cautiously take the third and final step in the interpretive process. [Citation.] . . . Where an uncertainty exists, we must consider the consequences that will flow from a particular interpretation. [Citation.] Thus, '[i]n determining what the Legislature intended we are bound to consider not only the words used, but also other

11

matters, "such as context, the object in view, the evils to be remedied, the history of the times and of legislation upon the same subject, public policy and contemporaneous construction." [Citation.]' [Citations.]" (*MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1084.)

An overarching principle for our interpretation of statutes is that courts have a "limited role in the process of interpreting enactments from the political branches of our state government. In interpreting statutes, we follow the Legislature's intent, as exhibited by the plain meaning of the actual words of the law, ' " 'whatever may be thought of the wisdom, expediency, or policy of the act.' " ' [Citations.] ' . . . [T]he judicial role in a democratic society is fundamentally to interpret laws, not to write them. . . .' [Citation.] It cannot be too often repeated that due respect for the political branches of our government requires us to interpret the laws in accordance with the expressed intention of the Legislature. 'This court has no power to rewrite the statute so as to make it conform to a presumed intention which is not expressed.' [Citations.]" (*California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist.* (1997) 14 Cal.4th 627, 632-633 (*California Teachers Assn.*).)

### C.    Standard of Review

Our interpretation of the language of section 226.2 "is an issue of law, which we review de novo. [Citation.]" (*United Riggers & Erectors, supra*, 4 Cal.5th at p. 1089.) Likewise, where, as is the case here, the relevant facts are undisputed, we review de novo the application of the law to those facts. (*International Engine Parts, Inc. v. Feddersen & Co.* (1995) 9 Cal.4th 606, 611; see also *Harustak v. Wilkins* (2000) 84 Cal.App.4th 208, 213 [appellate court "particularly well suited" to decide as question of law the meaning of statutory phrase].) Further, a determination regarding a statute's constitutionality is a question of law that we review de novo. (*Zubarau v. City of Palmdale* (2011) 192 Cal.App.4th 289, 307.)

12

The same standard of review applies to our review of the trial court's order denying summary adjudication. A party may move for summary adjudication as to one or more causes of action if it contends that there is no triable issue of fact or there is an absolute defense to the cause of action. (Code Civ. Proc., § 437c, subd. (f)(1).)[5] An appellate court scrutinizes the denial of summary adjudication by independent review. (*Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 972.) Such a ruling "resolves a pure question of law [citation], namely, whether there is any triable issue as to any material fact and, if not, whether the moving party is entitled to adjudication in his [or her] favor as a matter of law [Citation.]" (*Ibid.*)

---

[5] "A party may move for summary adjudication as to one or more causes of action within an action, one or more affirmative defenses, one or more claims for damages, or one or more issues of duty, if the party contends that the cause of action has no merit, that there is no affirmative defense to the cause of action, that there is no merit to an affirmative defense as to any cause of action, that there is no merit to a claim for damages, as specified in Section 3294 of the Civil Code, or that one or more defendants either owed or did not owe a duty to the plaintiff or plaintiffs. A motion for summary adjudication shall be granted only if it completely disposes of a cause of action, an affirmative defense, a claim for damages, or an issue of duty." (Code Civ. Proc., § 437c, subd. (f)(1).)

13

**D.     Background Concerning Enactment of AB 1513[6]**

There were two cases decided in 2013 by California courts of appeal that prompted the subsequent drafting and enactment of AB 1513.  In *Gonzalez*, *supra*, 215 Cal.App.4th at page 40, the Second District Court of Appeal addressed an employer's appeal from a judgment in favor of class action plaintiffs, automobile service technicians compensated on a piece-rate basis.  They successfully asserted they were entitled to be paid "a separate hourly minimum wage for time spent during work shifts waiting for vehicles to repair or performing other nonrepair tasks directed by the employer." (*Ibid.*)  The employer had asserted that "it was not required to pay the technicians a separate hourly minimum wage for such time because it ensured that a technician's total compensation for a pay period never fell below . . . the 'minimum wage floor'—the total number of hours the technician was at work during the pay period (including hours spent waiting for repair work or performing non-repair tasks), multiplied by the applicable minimum wage rate." (*Ibid.*)  The trial court concluded that the employer had violated California's minimum wage law, holding that "an employer [may not] avoid paying its employees for all hours worked by averaging total compensation over total hours worked in a given pay period." (*Ibid.*)  The specific wage law at issue in *Gonzalez* was Wage Order No. 4-2001 (Wage Order No. 4) which "provides as follows:  'Every employer

_____

[6] Because we conclude that the language of section 226.2(b) is clear and unambiguous and the court erred in holding that the Legislature did not intend the safe harbor provision to apply to rest/NP time claims accruing prior to July 1, 2012, under settled rules of statutory construction, we need not resort to consideration of legislative history.  (See *In re York*, *supra*, 9 Cal.4th at p. 1142.)  Our discussion here in which we provide background concerning the enactment of AB 1513 is nonetheless appropriate.  "[W]e may also ' "examine the history and background of the statutory provision in order to ascertain the most reasonable interpretation of the measure." [Citation.]' [Citation.]" (*Haniff v. Superior Court* (2017) 9 Cal.App.5th 191, 202 (*Haniff*).)  Even where, as here, "the plain language of the statutes dictates the result," legislative history may be considered to provide additional authority to confirm the court's statutory interpretation. (*Barratt American Inc. v. City of Rancho Cucamonga* (2005) 37 Cal.4th 685, 697.)

14

shall pay to each employee, on the established payday for the period involved, not less than the applicable minimum wage for all hours worked in the payroll period, whether the remuneration is measured by time, piece, commission, or otherwise.' (Cal.Code Regs., tit. 8, § 11040, subd. (4)(B).)" (*Gonzalez*, *supra*, at p. 44.)

The Court of Appeal in *Gonzalez* affirmed, concluding that the plaintiffs were entitled to separate compensation for time worked waiting for vehicles and performing other nonrepair duties. (*Gonzalez*, *supra*, 215 Cal.App.4th at pp. 40-41.) The court relied on *Armenta*, *supra*, 135 Cal.App.4th 314, a case that also involved interpretation of Wage Order No. 4. (*Gonzalez*, *supra*, at p. 45.) In *Armenta*, the employer—a company that maintained utility poles—had similarly compensated employees only for " 'productive' [time that] directly related to maintaining utility poles in the field" but did not pay employees for " 'nonproductive' " time such as travel to and from job sites. (*Gonzalez*, *supra*, at p. 46.) The *Armenta* court "held that use of such an averaging method to determine an employer's minimum wage obligation violates California law and that '[t]he minimum wage standard applies to each hour worked by [the employees] for which they were not paid.' [Citation.]" (*Gonzalez*, *supra*, at p. 48.) The *Gonzalez* court found *Armenta*'s reasoning persuasive. It held that "[b]y its terms, Wage Order No. 4 does not allow any variance in its application based on the manner of compensation." (*Gonzalez*, *supra*, at p. 49.) The *Gonzalez* court thus concluded the automobile service technicians were entitled to separate compensation for all hours worked and that the averaging method utilized by the employer did not satisfy California's minimum wage requirements. (*Gonzalez*, *supra*, at pp. 48-49.) In so holding, the *Gonzalez* court rejected the employer's argument that because the plaintiffs were piece-rate workers, *Armenta* was inapplicable. (*Gonzalez*, *supra*, at pp. 48-49; see also *Cardenas v. McLane FoodServices, Inc.* (C.D.Cal. 2011.) 796 F.Supp.2d 1246, 1250-1252 [formula that did not separately compensate piece-rate truck driver employees for required pre- and post-shift duties held noncompliant with the Labor Code].)

15

In *Bluford*, *supra*, 216 Cal.App.4th at page 866 (*Bluford*), the Third District Court of Appeal reversed the trial court's denial of class certification in an action by a truck driver claiming the employer had violated the law by, inter alia, failing to compensate him and other employees similarly situated for rest periods. The employer—similar to the position asserted by its counterpart in *Gonzalez* concerning hours spent on the job for tasks other than repair work—argued that it was not required to pay separate compensation to its piece-rate employees for rest periods. (*Bluford*, *supra*, at p. 871.) The appellate court disagreed. It noted that "[u]nder Industrial Welfare Commission wage orders, employers are required to 'authorize and permit all employees to take rest periods' at the rate of at least 10 minutes for every four hours worked. (Cal.Code Regs., tit. 8, §§ 11070, subd. 12; 11090, subd. 12.) 'Authorized rest periods shall be counted as hours worked for which there shall be no deduction from wages.' (*Ibid.*)" (*Ibid.*) The *Bluford* court, relying on *Armenta*, *supra*, 135 Cal.App.4th 314, held that "a piece-rate compensation formula that does not compensate separately for rest periods does not comply with California minimum wage law. [Citations.]" (*Bluford*, *supra*, at p. 872; cf. *Vaquero v. Stoneledge Furniture LLC* (2017) 9 Cal.App.5th 98, 108-110 [sales associates paid on commission basis entitled to separate compensation for rest periods].)

"In response to *Gonzalez* and *Bluford*, the Governor directed the [Labor and Workforce Development] Agency to take the lead in drafting and enacting legislation to address any penalties California employers should face as well as providing an expedited process by which piece-rate employees would receive years of back wages. The Agency thus assumed a key role in formulating and drafting AB 1513, and in coordinating with the Governor's office and members of the Legislature. In preparing legislative proposals for AB 1513, the Agency communicated with Legislative Counsel. The Agency also sought confidential input from key stakeholders including representatives of business and labor." (*Labor and Workforce Development Agency v. Superior Court* (2018) 19 Cal.App.5th 12, 18 (*LWDA*).)

16

The Legislature under AB 1513 codified the *Gonzalez/Bluford* decisions requiring employers to separately compensate piece-rate workers for rest/NP time periods at or above minimum wage.  As explained by the Legislative Counsel's Digest:  "This bill would require the itemized statement provided to employees compensated on a piece-rate basis to also separately state the total hours of compensable rest and recovery periods, the rate of compensation, and the gross wages paid for those periods during the pay period, and the total hours of other nonproductive time, as specified, the rate of compensation, and the gross wages paid for that time during the pay period.  The bill would require those employees to be compensated for rest and recovery periods and other nonproductive time at or above specified minimum hourly rates, separately from any piece-rate compensation."  (Legis. Counsel's Dig., Assem. Bill No. 1513 (2015-2016 Reg. Sess.) Stats.2015, Summary Dig., p. 5609.)  In addition, the new legislation "until January 1, 2021, would provide that an employer shall have an affirmative defense to any claim or cause of action for recovery of wages, damages, liquidated damages, statutory penalties, or civil penalties based solely on the employer's failure to timely pay the employee the compensation due for rest and recovery periods and other nonproductive time for time periods prior to and including December 31, 2015, if, by no later than December 15, 2016, the employer complies with specified requirements, subject to specified exceptions."  (*Ibid*; see also *Fowler Packing Company, Inc. v. Lanier* (9th Cir. 2016) 844 F.3d 809, 812 ["[t]o protect California businesses from unforeseen liability arising from *Gonzalez* and *Bluford*, . . . AB 1513 also created a 'safe harbor' that provided employers with an affirmative defense against claims alleging failure to pay previously for nonproductive work time . . . so long as they pay, no later than December 15, 2016, any minimum wage deficiencies occurring between July 1, 2012, and December 31, 2015"].)

Additionally, we note the comments to the Assembly Committee on Labor and Employment describing the background of AB 1513.  The Assembly Committee noted

that after the *Gonzalez* and *Bluford* decisions, "many employers have expressed concern about liability since they had not previously [separately] compensated employees paid on a piece rate system . . . [for rest/NP time]. They and others have expressed concerns that these decisions may generate significant litigation and administrative workload for employers, the courts, and the Labor Commissioner, in actions to recover back wages and penalties. This litigation will be costly and there is significant uncertainty whether workers will recover back pay, and when that may occur. [¶] Therefore, this bill represents compromise in an attempt to address many of these concerns. The legislation provides a means to resolve these issues in a way that is intended to: 1) reach more piece-rate workers and provide larger and more timely back pay recoveries than could be expected through litigation; 2) relieve employers of related liability for statutory penalties and damages for past violations; and 3) clarify compensation requirements going forward in a way that protects the right of piece-rate workers to be fully compensated for rest and recovery periods and other nonproductive time." (Assem. Com. on Labor and Employment, Rep. on Assem. Bill No. 1513 (2015 Reg. Sess.) Sept. 11, 2015, p. 5.)

    **E.    Labor Code Section 226.2**

Section 226.2, subdivision (a)—codifying the decisions in *Gonzalez* and *Bluford*—mandates that piece-rate employees receive compensation for all rest/NP time that is "separate from piece-rate compensation." (§ 226.2, subd. (a)(1).) Such employees are assured under an alternative formula in subdivision (a) that their compensation for rest and recovery time will be no less than minimum wage; in some instances the compensation may be greater than minimum wage. (§ 226.2, subd. (a)(3)(A), (B).) And an employer must compensate its piece-rate employees for nonproductive time at no less than the applicable minimum wage. (§ 226.2, subd. (a)(4).)

18

Under section 226.2(b), the safe harbor provision,[7] "[n]otwithstanding any other statute or regulation, the employer . . . shall have an affirmative defense to any claim or

_____

[7] Section 226.2(b) provides in its entirety: "Notwithstanding any other statute or regulation, the employer and any other person shall have an affirmative defense to any claim or cause of action for recovery of wages, damages, liquidated damages, statutory penalties, or civil penalties, including liquidated damages pursuant to Section 1194.2, statutory penalties pursuant to Section 203, premium pay pursuant to Section 226.7, and actual damages or liquidated damages pursuant to subdivision (e) of Section 226, based solely on the employer's failure to timely pay the employee the compensation due for rest and recovery periods and other nonproductive time for time periods prior to and including December 31, 2015, if, by no later than December 15, 2016, an employer complies with all of the following: [¶] (1) The employer makes payments to each of its employees, except as specified in paragraph (2), for previously uncompensated or undercompensated rest and recovery periods and other nonproductive time from July 1, 2012, to December 31, 2015, inclusive, using one of the formulas specified in subparagraph (A) or (B): [¶] (A) The employer determines and pays the actual sums due together with accrued interest calculated in accordance with subdivision (c) of Section 98.1. [¶] (B) The employer pays each employee an amount equal to 4 percent of that employee's gross earnings in pay periods in which any work was performed on a piece-rate basis from July 1, 2012, to December 31, 2015, inclusive, less amounts already paid to that employee, separate from piece-rate compensation, for rest and recovery periods and other nonproductive time during the same time, provided that the amount by which the payment to each employee may be reduced for amounts already paid for other nonproductive time shall not exceed 1 percent of the employee's gross earnings during the same time. [¶] (2) Payment shall not be required for any part of the time period specified in paragraph (1) for which either of the following apply: [¶] (A) An employee has, prior to August 1, 2015, entered into a valid release of claims not otherwise banned by this code or any other applicable law for compensation for rest and recovery periods and other nonproductive time. [¶] (B) A release of claims covered by this subdivision executed in connection with a settlement agreement filed with a court prior to October 1, 2015, and later approved by the court. [¶] (3) By no later than July 1, 2016, the employer provides written notice to the department of the employer's election to make payments to its current and former employees in accordance with the requirements of this subdivision and subdivision (c). [¶] (A) The notice must include the legal name and address of the employer and must be mailed or delivered to the Director of Industrial Relations, Attn: Piece-Rate Section, 226.2 Election Notice, 1515 Clay Street, 17th Floor, Oakland, CA 94612. The director may provide for an email address to receive notices electronically in lieu of postal mail. [¶] (B) The department shall post on its Internet Web site either a list of the employers who have provided the required notice or copies of the actual notices. The list or notices shall remain posted until March 31, 2017. [¶] (4) The employer

cause of action for recovery of wages, damages, liquidated damages, statutory penalties, or civil penalties, including liquidated damages pursuant to Section 1194.2, statutory penalties pursuant to Section 203, premium pay pursuant to Section 226.7, and actual damages or liquidated damages pursuant to subdivision (e) of Section 226, based solely on the employer's failure to timely pay the employee the compensation due for rest and recovery periods and other nonproductive time for time periods prior to and including December 31, 2015, if, by no later than December 15, 2016," it complies with the enumerated steps in section 226.2(b). Those steps include completing payment to employees for all unpaid rest/NP time "from July 1, 2012, to December 31, 2015, inclusive." (§ 226.2(b)(1).) The employer may choose one of two specified formulas in calculating the rate of compensation for such unpaid rest/NP time. (*Ibid.*) The statute also mandates that the employer provide each employee with a statement that includes a recitation that payment was made under the statute, the method of calculation used, and,

---

calculates and begins making payments to employees as soon as reasonably feasible after it provides the notice referred to in paragraph (3) and completes the payments by no later than December 15, 2016, to each employee to whom the wages are due, or to the Labor Commissioner pursuant to Section 96.7 for any employee whom the employer cannot locate. [¶] (5) The employer provides each employee receiving a payment with an accompanying accurate statement that contains all of the following information: [¶] (A) A statement that the payment has been made pursuant to this section. [¶] (B) A statement as to whether the payment was determined based on the formula in subparagraph (A) of paragraph (1), or on the formula in subparagraph (B) of paragraph (1). [¶] (C) If the payment is based on the formula in subparagraph (A) of paragraph (1), a statement, spreadsheet, listing, or similar document that states, for each pay period for which compensation was included in the payment, the total hours of rest and recovery periods and other nonproductive time of the employee, the rates of compensation for that time, and the gross wages paid for that time. [¶] (D) If the payment is based on the formula in subparagraph (B) of paragraph (1), a statement, spreadsheet, listing, or similar document that shows, for each pay period during which the employee had earnings during the period from July 1, 2012, through December 31, 2015, inclusive, the gross wages of the employee and any amounts already paid to the employee, separate from piece-rate compensation, for rest and recovery periods and other nonproductive time. [¶] (E) The calculations that were made to determine the total payment made."

20

by spreadsheet or similar document, a detailed calculation of the payment. (§ 226.2(b)(5).) The employer must provide under the safe harbor provision a written notice to the DIR on or before July 1, 2016, of the employer's intention to make payments to current and former employees for prior unpaid rest/NP time. (§ 226.2(b)(3).) And there is an outside deadline for the employer to make the payments for all unpaid rest/NP time—whether to the employee directly or to the Labor Commissioner if the employee cannot be located—of December 15, 2016. (§ 226.2(b)(4).)

Under subdivision (c) of section 226.2, an employer may assert the defense under the safe harbor provision notwithstanding its good faith failure to make a payment to one or more employees as required under section 226.2(b)(1), or its good faith failure to provide an accurate statement as required under section 226.2(b)(5), if the employer promptly remedies the error. Subdivision (d) contains, inter alia, a requirement that the employer use due diligence to locate and pay former employees. Subdivision (e) tolls the statute of limitations for rest/NP time claims accruing before January 1, 2016, for periods (1) from January 1, 2016 through July 1, 2016, as to instances in which the employer has not provided a notice of its intention to pay prior amounts due for accrued rest/NP time, and (2) from January 1, 2016 through December 15, 2016, as to instances in which the employer has provided such a notice. Further, application of the safe harbor provision is subject to six exceptions specified in subdivision (g). Lastly, there is a sunset clause for the statute, including the safe harbor subdivision, of January 1, 2021. (§ 226.2, subd. (k).)

## F. Safe Harbor Applies to All Claims Accruing Prior to and Including December 31, 2015

### 1. *Section 226.2(b) Is Not Ambiguous*

In resolving the question of the scope of the safe harbor defense, we begin by "examin[ing] . . . the actual language of the statute. [Citations.]" (*Halbert's Lumber, supra*, 6 Cal.App.4th at p. 1238.) The statute provides that, if the employer complies

21

with certain requirements (including payment to current and former piece-rate employees) on or before December 15, 2016, it may assert "an affirmative defense to "*any* claim or cause of action . . . based solely on the employer's failure to pay the employee for [rest/NP time] for time periods prior to and including December 31, 2015 . . ." (§ 226.2(b), italics added.)  After this prefatory language, section 226.2(b) recites in five subparts the specific tasks the employer must accomplish by December 15, 2016, to avail itself of the safe harbor.  One requirement is that the employer pay its current and former employees prior amounts due for unpaid rest/NP time "from July 1, 2012, to December 31, 2015," utilizing one of two formulas presented in the statute.  (§ 226.2(b)(1).)

Real party in interest Lainez argues that the language in section 226.2(b), "time periods prior to and including December 31, 2015," "does not have a plain or unequi-vocal meaning."  He contends that because the words "all" or "any" do not precede the phrase, "time periods prior to and including December 31, 2015," the language is reasonably susceptible of an interpretation that only claims accruing between July 1, 2012 and December 31, 2015, are subject to the safe harbor provision.  For several reasons, we disagree, and we find that the language of section 226.2(b) is not reasonably susceptible of the construction advanced by Lainez.

First, the relevant statutory language refers to "*any* claim or cause of action" (§ 226.2(b), italics added) with a date restriction of "prior to and including December 31, 2015."  " 'Any' is a term of broad inclusion." (*Lopez v. Sony Electronics, Inc.* (2018) 5 Cal.5th 627, 635.)  It "means without limit and no matter what kind. [Citation.]" (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 798; see also *Zabrucky v. McAdams* (2005) 129 Cal.App.4th 618, 628 [the word " 'any' mean[s] 'of whatever kind' or 'without restriction' "].)  Thus, the use of "any" in the statute "unambiguously reflects a legislative intent for that statute to have a broad application.  [Citations.]" (*Department of California Highway Patrol v. Superior Court* (2008) 158 Cal.App.4th 726, 736.)

22

Because the plain import of "any" is the absence of restriction or limitation (*U.S. ex rel. Barajas v. U.S.* (9th Cir. 2001) 258 F.3d 1004, 1011), it is not reasonable to infer a date limitation in the safe harbor provision other than the one specified by the Legislature, i.e., "prior to and including December 31, 2015."

Second, other language in section 226.2 supports the Legislature's clear intent, as expressed in the first paragraph of 226.2(b), that the safe harbor applies to any unpaid rest/NP time claims accruing on or prior to December 31, 2015. The Legislature provided that "[c]laims for unpaid wages, damages, and penalties that accrue after January 1, 2016" were expressly excepted from the safe harbor. (§ 226.2, subd. (g)(4).) Thus, considering " 'the context of the statute as a whole and the overall statutory scheme" (*Smith v. Superior Court* (2006) 39 Cal.4th 77, 83), the statutory intent of the safe harbor provision was to provide a defense to employers for *any* pre-2016 claims for unpaid rest/NP time.

Third, it would have been a simple matter for the Legislature, had it wished, to have limited the safe harbor provision to claims for time periods from July 1, 2012 through December 31, 2015. It could have easily provided for a limitation of pre-2016 claims covered by the safe harbor to those accruing on or after July 1, 2012. Similarly, had this been its intent, the Legislature could have specified in subdivision (g)(4) that the safe harbor exclusion applied to "[c]laims for unpaid wages, damages, and penalties that accrue [*before July 1, 2012, or*] after January 1, 2016." (*Ibid.*, bracketed italics added denoting potential statutory rewrite.) "We must assume that the Legislature knew how to create an exception if it wished to do so; nothing would have been simpler than to insert [language creating an exception]." (*City of Ontario v. Superior Court* (1993) 12 Cal.App.4th 894, 902.) Moreover, as drafted, section 226.2 contains numerous (38) references to specific dates and several (seven) designations of particular timespans. The Legislature here has demonstrated that it knew how to identify a particular date or a specific time interval, and it chose not to do so; it did not describe the pre-2016 safe

23

harbor period as having a date beginning on July 1, 2012. (Cf. *People v. Murphy* (2001) 25 Cal.4th 136, 143 [where Legislature demonstrates ability to express specific requirement and fails to use that language in a particular statute, absence of such language in a similar enactment shows Legislature did not intend to impose that requirement].)

Fourth, Lainez's construction of the safe harbor provision is contrary to the sound policy against the judicial rewriting of legislation. As explained by our high court, "We may not, however, insert qualifying provisions not included or rewrite the statute to conform to an inferred intention that does not appear from its language. [Citations.]" (*Mills v. Superior Court* (1986) 42 Cal.3d 951, 957, superseded by constitutional amendment on other grounds as stated in *Whitman v. Superior Court* (1991) 54 Cal.3d 1063, 1076; see also *California Teachers Assn.*, *supra*, 14 Cal.4th at p. 633.) This rule is codified in Code of Civil Procedure section 1858, under which the court is prohibited from "insert[ing] what has been omitted, or . . . omit[ting] what has been inserted" from a statute. (See *People v. Guzman* (2005) 35 Cal.4th 577, 587 (*Guzman*).) Here, adopting Lainez's position would require that we rewrite the first paragraph of section 226.2(b) to read "any claim or cause of action for recovery . . . for time periods prior to and including December 31, 2015*, [but on or after July 1, 2012,*] . . . .*"* (Italics added to denote potential statutory rewrite.) Further, were Lainez's position credited, we would be compelled to rewrite subdivision (g)(4) of section 226.2 to provide that "[c]laims for unpaid wages, damages, and penalties that accrue after January 1, 2016 [*or prior to July 1, 2012*]" are expressly excepted from the safe harbor. (Italics added to denote potential statutory rewrite.) Such judicial statutory revision is prohibited. (*Guzman*, *supra*, at p. 587; see also *Haniff*, *supra*, 9 Cal.App.5th at pp. 201-202.)

Fifth, concluding that the safe harbor of section 226.2(b) does not apply to pre-July 1, 2012 claims would run counter to *expressio unius est exclusio alterius.* Under this " 'familiar rule of construction, . . . where exceptions to a general rule are specified by

statute, other exceptions are not to be implied or presumed.' [Citation.]" (*Mutual Life Ins. Co. v. City of Los Angeles* (1990) 50 Cal.3d 402, 410.) Thus, "if exemptions are specified in a statute, we may not imply additional exemptions unless there is a clear legislative intent to the contrary. [Citation.]" (*Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1230.) Here, the Legislature expressly provided—as one of the six specified exceptions to section 226.2(b)[8]—that claims arising after January 1, 2016, would not be governed by the safe harbor provision. (See § 226.2, subd. (g)(4).) We may not infer a further exception for claims accruing prior to July 1, 2012, absent a clear showing that the Legislature had an intent contrary to the express language of the statute. (See, e.g., *FNB Mortg. Corp. v. Pacific General Group* (1999) 76 Cal.App.4th 1116, 1131 [where 10-year statute of limitations under Code Civ. Proc., § 337.15 contained

---

[8] Subdivision (g) of section 226.2 provides in its entirety: "The provisions in subdivisions (b), (c), (d), (e), and (f) shall not apply to any of the following: [¶] (1) Damages and penalties previously awarded in an order or judgment that was final and not subject to further appeal as of January 1, 2016. [¶] (2) Claims based on the failure to provide paid rest or recovery periods or pay for other nonproductive time for which all of the following are true: [¶] (A) The claim was asserted in a court pleading filed prior to March 1, 2014, or was asserted in an amendment to a claim that relates back to a court pleading filed prior to March 1, 2014, and the amendment or permission for amendment was filed prior to July 1, 2015. [¶] (B) The claim was asserted against a defendant named with specificity and joined as a defendant, other than as an unnamed (DOE) defendant pursuant to Section 474 of the Code of Civil Procedure, in the pleading referred to in subparagraph (A), or another pleading or amendment filed in the same action prior to January 1, 2015. [¶] (3) Claims that employees were not advised of their right to take rest or recovery breaks, that rest and recovery breaks were not made available, or that employees were discouraged or otherwise prevented from taking such breaks. [¶] (4) Claims for unpaid wages, damages, and penalties that accrue after January 1, 2016. [¶] (5) Claims for paid rest or recovery periods or pay for other nonproductive time that were made in any case filed prior to April 1, 2015, when the case contained by that date an allegation that the employer has intentionally stolen, diminished, or otherwise deprived employees of wages through the use of fictitious worker names or names of workers that were not actually working. [¶] (6) An employer that is a new motor vehicle dealer, as defined by Section 426 of the Vehicle Code."

several express exceptions, court would not infer unstated tolling exception based upon promise to make repairs].)

Sixth, our duty in construing the statute is to "apply common sense to the language at hand and interpret the statute to make it workable and reasonable. [Citation.]" (*Wasatch Property Management*, *supra*, 35 Cal.4th at p. 1122.) Interpreting the safe harbor of section 226.2(b) to apply to *all* claims or causes of action for rest/NP time accruing on or before December 31, 2015, not only is consistent with the plain language of the statute; it is a construction that "make[s the statute] workable and reasonable." (*Wasatch Property Management*, *supra*, at p. 1122.) An employer that complies with the statute by, inter alia, timely paying all employees for unpaid rest/NP time that accrued in the 42 months prior to the effective date of the statute, January 1, 2016, will be entitled to assert such compliance as "an affirmative defense to any claim or cause of action [for monetary relief]" for rest/NP time claims accruing "for time periods prior to and including December 31, 2015." (§ 226.2(b).) It would not make sense—and would thus be unworkable and unreasonable—to construe the statute as setting forth a detailed method by which the employer may avoid liability and potentially lengthy and expensive litigation by making payments for a time period spanning up to 42 months, while discouraging the employer from making those payments by leaving it exposed to liability and litigation for older claims (i.e., those accruing prior to July 1, 2012). Moreover, such a construction would be unreasonable in that it would afford the employer no safe harbor for pre-July 2012 claims—ones that arose during a period in which the employer's liability to pay separate compensation for rest/NP time to piece-rate workers was not clear—while providing the employer with a defense for previously unpaid rest/NP time

26

that accrued *after* the clarifying decisions of *Gonzalez* and *Bluford* were rendered in March and May 2013, respectively.[9]

Seventh, we construe the statute to ascertain the intent of the Legislature " 'so as to effectuate the purpose of the law.' [Citation.]" (*Moyer v. Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 (*Moyer*).) We interpret the language of section 226.2 by " 'keeping in mind the nature and obvious purpose of the statute where they appear' [citations]." (*Moyer*, at p. 230.) With that in mind, the intent of the safe harbor provision is clear: It provides a straightforward method of compensating piece-rate workers for unreimbursed pre-2016 rest/NP time without protracted, expensive, and uncertain litigation, while providing incentive to employers to reimburse employees voluntarily by affording them a defense to further claims based solely upon their failure to have made such payments. Interpreting the language of the safe harbor as providing employers with a defense to all claims and causes of action accruing "for time periods prior to and including December 31, 2015" (§ 226.2(b))—as clearly provided in subdivision (b)— effectuates the purpose of the statute.

In denying the motion for summary adjudication, the trial court found that "the [L]egislature did not intend to deprive piece[-]rate workers of their rights to receive compensation for rest periods and other non-productive time for time periods prior to July 1, 2012." Lainez urges that the court's conclusion regarding legislative intent was

---

[9] Construing section 226.2 as providing a safe harbor only for rest/NP time claims that accrued between July 1, 2012, and December 31, 2015, would be impractical and unreasonable for an additional reason. Although the question of whether the specific pre-July 2012 rest/NP time claims were stale was not addressed below, generally speaking, actions based upon wage liabilities created by statute are governed by the three-year statute of limitations of Code of Civil Procedure section 338, subdivision (a). (See *Cuadra v. Millan* (1998) 17 Cal.4th 855, 859, disapproved on other grounds in *Samuels v. Mix* (1999) 22 Cal.4th 1, 16, fn. 4.) Thus, at the time section 226.2 became effective on January 1, 2016, unasserted statutory rest/NP time claims that had accrued prior to January 1, 2013, might be barred by the applicable statute of limitations.

correct, arguing that the language at the beginning of section 226.2 "expressly prohibits an interpretation that would divest piece[-]rate workers of their earned wages."

The preamble of section 226.2 reads in part: "This section shall apply for employees who are compensated on a piece-rate basis for any work performed during a pay period. This section shall not be construed to limit or alter minimum wage or overtime compensation requirements, or the obligation to compensate employees for all hours worked under any other statute or local ordinance." Lainez contends that because the courts in *Gonzalez* and *Bluford* made it clear that employers were required to comply with minimum wage requirements under section 1197 by compensating piece-rate workers separately for rest/NP time, a construction of section 226.2(b) that would provide complying employers with a safe harbor for rest/NP time claims accruing prior to July 1, 2012 "would 'alter' or 'limit' those preexisting minimum wage obligations under [s]ection 1197."

Although statements of the purpose or intent of legislation in a preamble "do not confer power, determine rights, or enlarge the scope of a measure, they properly may be utilized as an aid in construing a statute," but are not conclusive. (*People v. Canty* (2004) 32 Cal.4th 1266, 1280; see also *Carter v. California Dept. of Veterans Affairs* (2006) 38 Cal.4th 914, 925 [preamble is an aid to interpreting statute but it is not controlling].) "Legislative findings and statements of purpose in a statute's preamble can be illuminating if a statute is ambiguous. [Citation.] But a preamble is not binding in the interpretation of the statute. Moreover, the preamble may not overturn the statute's language. [Citations.]" (*Yeager v. Blue Cross of California* (2009) 175 Cal.App.4th 1098, 1103, fn. omitted (*Yeager*).) This point has been reiterated in a leading treatise: "In general, statements regarding the scope or purpose of an act that appear in the preamble may aid in the construction of doubtful clauses, but they cannot control the substantive provisions of the statute." (1A Singer & Singer, Sutherland Statutes and Statutory Construction (7th ed. 2009), § 20:3, p. 123, fn. omitted.)

28

Here, the language in section 226.2(b) that an employer complying with the statute's requirements "shall have an affirmative defense to any claim or cause of action for recovery . . . for time periods prior to and including December 31, 2015" is clear and unambiguous. Since section 226.2's preamble does not expressly state an intention that its safe harbor provision be limited to those rest/NP claims accruing between July 1, 2012, and December 31, 2015, we will not construe the general language of the preamble in a manner that contradicts the express language of subdivision (b). (*Yeager*, *supra*, 175 Cal.App.4th at p. 1103; see also *Chambers v. Miller* (2006) 140 Cal.App.4th 821, 825-826 [preamble to statute "does not override its plain operative language"].)

We conclude therefore that, based upon the plain meaning of the language of section 226.2(b), the employer safe harbor applies to *any* claims or causes of action for unpaid rest/NP time that accrued prior to and including December 31, 2015. We do not agree with the conclusion by the court below that the statute is ambiguous, and we find that section 226.2(b) is not reasonably susceptible of the interpretation that the safe harbor defense applies only to rest/NP time claims that accrued in the three and one-half years before the December 31, 2015 date specified in the statute (i.e., between July 1, 2012 and December 31, 2015).

### 2. *Lainez's Due Process Contention*

Lainez makes a constitutional argument in further support of his position that the trial court did not err. He contends that interpreting section 226.2(b) as providing a safe harbor for all rest/NP time claims accruing prior to and including December 31, 2015, would result in a taking of the vested property rights of piece-rate workers in violation of the takings clause of the Fifth Amendment of the United States Constitution.[10]

---

[10] "As relevant here, the Fifth Amendment provides that no person shall 'be deprived of . . . property, without due process of law; nor shall private property be taken for public use without just compensation.' The latter provision is commonly referred to

Lainez did not make this argument below that the safe harbor provision as drafted would violate the takings clause of the Fifth Amendment. As a general rule, "constitutional issues not raised in earlier civil proceedings are waived on appeal. [Citations.]" (*Bettencourt v. City and County of San Francisco* (2007) 146 Cal.App.4th 1090, 1101; see *Fourth La Costa Condominium Owners Assn. v. Seith* (2008) 159 Cal.App.4th 563, 585 [failure to raise at trial contention that statute was unconstitutional because it violated procedural due process and equal protection rights resulted in its forfeiture on appeal].) This principle applies equally to arguments not raised in summary judgment proceedings. (*Saville v. Sierra College* (2005) 133 Cal.App.4th 857, 872-873 [unasserted issue in opposing motion for summary judgment forfeited; were doctrine not applied, losing parties "could attempt to embed grounds for reversal on appeal into every case by their silence"].) Lainez has forfeited the constitutional argument.

Lainez, as the party asserting unconstitutionality, "bears a substantial burden" of establishing the claim. (*Eastern Enterprises v. Apfel* (1998) 524 U.S. 498, 523 (*Eastern Enterprises*).) Even if we were to consider the merits of his federal due process contention as a pure question of law presented by undisputed facts (*Hale v. Morgan* (1978) 22 Cal.3d 388, 394), we would conclude it to be without merit.[11]

_____

as the 'takings clause.' " (*Santa Monica Beach, Ltd. v. Superior Court* (1999) 19 Cal.4th 952, 984, fn. 2 (dis. opn. of Baxter, J.).)

[11] The California Constitution contains a parallel takings clause. (See Cal. Const., art. I, § 19.) Lainez does not assert here that the construction of section 226.2(b) advanced by Jackpot would violate the takings clause of the California Constitution. We therefore do not separately consider the issue. (See *Kim v. Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979 [notwithstanding de novo standard of review of summary judgment, appellate court's function is not to address arguments not raised on appeal or issues for which authorities are not cited].) Generally, however, the federal and state takings clauses are construed congruently. (*San Remo Hotel v. City and County of San Francisco* (2002) 27 Cal.4th 643, 664.)

30

The takings clause of the Fifth Amendment, made applicable to the states through the Fourteenth Amendment (*Chicago, B. & Q. R. Co. v. Chicago* (1897) 166 U.S. 226, 239), has as its purpose the "prevent[ion of] the government 'from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' [Citation.]" (*Eastern Enterprises*, *supra*, 524 U.S. at p. 522.) As the United States Supreme Court has explained: "[T]hough the classic taking is a transfer of property to the State or to another private party by eminent domain, the Takings Clause applies to other state actions that achieve the same thing. Thus, when the government uses its own property in such a way that it destroys private property, it has taken that property. [Citations.] Similarly, our doctrine of regulatory takings 'aims to identify regulatory actions that are functionally equivalent to the classic taking.' [Citation.] . . . Finally . . . , States effect a taking if they recharacterize as public property what was previously private property. [Citation.]" (*Stop the Beach Renourishment, Inc. v. Florida Dept. of Environmental Protection* (2010) 560 U.S. 702, 713.) Initially, in evaluating a challenge under the takings clause, the court resolves whether there is, in fact, a constitutionally protected property right implicated. (*Peterson v. U.S. Dept. of Interior* (9th Cir. 1990) 899 F.2d 799, 807; see, e.g., *Bowen v. Public Agencies Opposed to Social Security Entrapment* (1986) 477 U.S. 41, 55 [states' contractual right to withdraw state and local government employees from Social Security System "did not rise to the level of 'property' " and "[could] not be viewed as conferring any sort of 'vested right' "].)

Lainez's constitutional argument is based upon the broad assertion that construing section 226.2(b) as a safe harbor to *all* claims accruing on or prior to December 31, 2015, would violate the takings clause of the Fifth Amendment because it "would result in piece[-]rate workers being divested of their earned wages—effectively taking their property away from them and transferring it to the employers who failed to pay them their wages." Lainez argues that he and other similarly situated piece-rate workers have vested property rights to claims for unpaid rest/NP time accruing prior to July 1, 2012, of

31

which they would be unconstitutionally deprived if section 226.2(b) were interpreted as providing a safe harbor to complying employers against all rest/NP time claims accruing prior to and including December 31, 2015. Lainez has cited no cases holding that an employer's failure to separately pay minimum wages for a piece-rate employee's rest/NP time prior to the appellate courts in *Gonzalez* and *Bluford* making this requirement clear created a vested right in favor of the employee to such compensation.

Jackpot responds that the takings clause of the Fifth Amendment is not implicated. Jackpot cites a body of law rejecting constitutional challenges by employees to an amendment to a federal labor statute. The statute was the Fair Labor Standards Act of 1937 (29 U.S.C. § 201 et seq.; the FLSA), and the amendment was the Portal-to-Portal Act (29 U.S.C. § 251 et seq.).

In 1938, Congress enacted the FLSA, which "established a minimum wage and overtime compensation for each hour worked in excess of 40 hours in each workweek" for workers engaged in commerce or in the production of goods for commerce within the meaning of the act. (*Integrity Staffing Solutions, Inc. v. Busk* (2014) ___ U.S.___, 135 S.Ct. 513, 516 (*Integrity Staffing*).) As explained by our nation's high court, the FLSA did not include definitions of " 'work' " or " 'workweek,' " and the Supreme Court, "[a]pplying . . . expansive definitions [to those terms], . . . found compensable the time spent [by employees] traveling between mine portals and underground work areas, [citation], and the time spent walking from timeclocks to work benches, [citation]. [¶] These decisions provoked a flood of litigation . . . [namely,] more than 1,500 lawsuits under the FLSA [citation]. These suits sought nearly $6 billion in back pay and liquidated damages for various preshift and postshift activities. [Citation.] [¶] Congress responded swiftly. It found that the FLSA had 'been interpreted judicially in disregard of long-established customs, practices, and contracts between employers and employees, thereby creating wholly unexpected liabilities, immense in amount and retroactive in operation, upon employers.' [Citation.] Declaring the situation to be an 'emergency' "

32

(*Integrity Staffing*, *supra*, 135 S.Ct. at p. 516), Congress passed an amendment to the FLSA, the Portal-to-Portal Act, which created an exemption for employers for future claims for compensation for certain activities, including "activities which are preliminary to or postpreliminary to" the employee's principal work activity. (29 U.S.C. § 254(a)(2).)

Employees mounted a number of constitutional challenges to the Portal-to-Portal Act, which had effectively barred their claims for compensation for preshift and postshift activity. They argued, inter alia, that the amendment violated the takings clause of the Fifth Amendment. The constitutional claims were uniformly rejected. (See *Moss v. Hawaiian Dredging Co.* (9th Cir. 1951) 187 F.2d 442, 445, fn. 3 (*Moss*) [citing 16 cases upholding constitutionality of Portal-to-Portal Act].) In *Battaglia v. General Motors Corp.* (2d Cir. 1948) 169 F.2d 254 (*Battaglia*), the plaintiffs contended that although "the employees' rights to overtime compensation ultimately flow[ed] from the [FLSA], they [were] also in some sense 'contractual' in nature and hence vested." (*Id.* at p. 258, fn. omitted.) The Ninth Circuit Court of Appeals disagreed, concluding the Portal-to-Portal Act was constitutional, and that Congress's decision to amend the FLSA in the exercise of its power to regulate commerce did not violate the takings clause of the Fifth Amendment. (*Battaglia*, *supra*, at pp. 259-260, 261.)

Likewise, the court in *Seese v. Bethlehem Steel Co.* (4th Cir. 1948) 168 F.2d 58, 62 (*Seese*) addressed whether "under the Fifth Amendment[, the Portal-to-Portal Act] takes property without due process in that it strikes down vested rights under existing contracts." The court of appeals rejected the constitutional challenge, holding that "even rights arising out of contract cannot fetter [C]ongress in the exercise of a power granted it by the Constitution, and . . . the rights stricken down by the statute are not rights arising out of contract at all, but rights created by statute as an incident of the statutory regulation of commerce. The Portal-to-Portal Act of May 14, 1947, like the [FLSA] which it modified and amended, was an exercise by Congress of the power to regulate interstate and foreign commerce; and it is well settled that the exercise of such power is not

33

invalidated even by the fact that its effect is to destroy rights under valid existing contracts." (*Ibid.*; see also *Fisch v. General Motors Corp.* (6th Cir. 1948) 169 F.2d 266, 270-272 [Portal-to-Portal Act did not deprive workers of vested rights in violation of due process].)

Further, in *Moss*, *supra*, 187 F.2d 442, the court rejected a constitutional challenge by employees to a different amendment to the FLSA. There, the plaintiffs had urged in litigation that a section of the FLSA should be interpreted as entitling them to overtime on overtime. (*Id.* at p. 443.) After trial but prior to decision in *Moss*, the United States Supreme Court rendered its decision in *Bay Ridge Co. v. Aaron* (1948) 334 U.S. 446 (*Bay Ridge*), which had the effect of validating the plaintiffs' argument. (*Moss*, *supra*, at p. 443.) And prior to judgment being entered in *Moss*, Congress passed legislation, "popularly known as the Overtime-on-Overtime Act," which amended the FLSA and retroactively sustained the positions of the employer defendants that they had properly paid overtime to the employees. (*Moss*, *supra*, at p. 444.) The plaintiffs, challenging the constitutionality of the Overtime-on-Overtime Act amending the FLSA, argued "that when they did the work for which additional compensation [was] sought [in the lawsuit] they acquired rights to overtime compensation under the [FLSA], the measure of which overtime compensation was required to be as stated in the *Bay Ridge* decision. These, they say, were vested rights, contractual in nature." (*Moss*, *supra*, at p. 444-445.) The Ninth Circuit Court of Appeals, relying on the Portal-to-Portal Act cases discussed, *ante*, upheld the constitutional validity of the Overtime-on-Overtime Act. (*Moss*, *supra*, at p. 446-447.)

The analogy between due process challenges to amendments to the FLSA and those directed to section 226.2 addressing compensation for rest/NP time for piece-rate

34

workers, while perhaps not perfect,[12] nonetheless informs our conclusion that the safe harbor provision is not violative of the takings clause of the Fifth Amendment. We see no distinction between the claims for preshift and postshift compensation affected by the Portal-to-Portal Act amending the FLSA, and the pre-July 2012 rest/NP time claims affected here by the enactment of section 226.2. As found by the courts in such cases as *Battaglia*, *supra*, 169 F.2d at pages 259 to 260 and *Seese*, *supra*, 168 F.2d at page 62, the Portal-to-Portal Act, notwithstanding its impact on the employees' preshift and postshift compensation claims, did not constitute a violation of the takings clause of the Fifth Amendment. The same conclusion applies here to section 226.2 and its impact upon employees' pre-July 2012 rest/NP time claims.

As the California Supreme Court has explained: "All presumptions and intendments favor the validity of a statute and mere doubt does not afford sufficient reason for a judicial declaration of invalidity. Statutes must be upheld unless their unconstitutionality clearly, positively and unmistakably appears. [Citation.]" (*Lockheed Aircraft Corp. v. Superior Court* (1946) 28 Cal.2d 481, 484).) We conclude that the safe harbor provision, as construed to apply to all claims for unpaid rest/NP time accruing prior to and including December 31, 2015, is not an unconstitutional taking. (See

---

**12** For example, Congress, in enacting the Portal-to-Portal Act, made detailed findings expressing the necessity of the legislation as a matter of national public interest, stating that, because the FLSA had " 'been interpreted judicially in disregard of long-established customs, practices, and contracts between employers and employees, thereby creating wholly unexpected liabilities, immense in amount and retroactive in operation, upon employers with the results that if [the FLSA] as so interpreted or claims arising under such interpretations were permitted to stand, . . . the payment of such liabilities would bring about financial ruin of many employers and seriously impair the capital resources of many others . . . [and] the courts of the country would be burdened with excessive and needless litigation.' " (*Seese*, *supra*, 168 F.2d at p. 60.) While Jackpot contends that the California Legislature enacted AB 1513 "to avoid disastrous effects to [California's] economy due to unanticipated judicial interpretations" of minimum wage laws as applied to piece-rate employees, there are, unlike the Portal-to-Portal Act, no express urgency findings in the legislation that we consider here.

35

*Eastern Enterprises*, *supra*, 524 U.S. at p. 523 [party asserting unconstitutionality "bears a substantial burden"].)

### 3. *Conclusion*

Section 226.2(b) provides an affirmative defense to "*any* [employee] claim or cause of action" arising out of "previously uncompensated or undercompensated" "[rest/NP time] for time periods prior to and including December 31, 2015," where the employer complies with various requirements, including reimbursing the employee for unpaid rest/NP time "from July 1, 2012, to December 31, 2015, inclusive." (§ 226.2(b)(1), italics added.)  The language of subdivision (b) makes clear that the employer safe harbor applies to *all* pre-2016 claims, as confirmed elsewhere in the statute noting the safe harbor to be inapplicable to claims accruing after January 1, 2016.  (See § 226.2, subd. (g)(6).)  And the specification in subdivision (g) of six exceptions to the safe harbor, without inclusion of an exception for pre-July 1, 2012 claims, is further evidence of this intent.  The language of subdivision (b) is not reasonably susceptible of the interpretation advanced by Lainez and adopted by the court below.  Section 226.2(b) clearly and unambiguously provides that employers complying with the statute will receive, through the availability of an affirmative defense, a safe harbor for all claims and causes of action arising solely from the failure to pay rest/NP time as to any such claims accruing prior to and including December 31, 2015.

In reaching this conclusion, we are guided by the overarching principle that the court's " 'role in a democratic society is fundamentally to interpret laws, not to write them. . . .'  [Citation.] . . . 'This court has no power to rewrite the statute so as to make it conform to a presumed intention which is not expressed.'  [Citations.]" (*California Teachers Assn.*, *supra*, 14 Cal.4th at pp. 632-633.)  Interpreting section 226.2 as providing an employer safe harbor for rest/NP claims accruing on or prior to December 31, 2015, but not for those claims accruing prior to July 1, 2012, would effectively

36

require us to rewrite the statute. We respectfully submit that any requests for changes to the statutory language must be presented to the Legislature.

## IV.   DISPOSITION

Let a peremptory writ of mandate issue commanding respondent superior court to vacate its order of May 17, 2017, and enter a new order granting the motion of petitioner Jackpot Harvesting Company, Inc. (Jackpot) for summary adjudication of the first cause of action of the complaint. Upon finality of this opinion, the temporary stay issued by this court is vacated. Statutory costs are awarded to Jackpot.

_____

BAMATTRE-MANOUKIAN, J.

WE CONCUR:

_____

ELIA, ACTING P.J.

_____

MIHARA, J.

*Jackpot Harvesting Co., Inc. v. Superior Court*
**H044764**

| | |
|---|---|
| Trial Court: | Monterey County Superior Court<br>Court No.:  15CV000491 |
| Trial Judge: | The Honorable<br>Lydia M. Villarreal |
| Attorneys for Petitioner<br>Jackpot Harvesting Company, Inc.: | Patane Gumberg Avila, LLP<br>James K. Gumberg<br>Jennifer C. Owens |
| Attorneys for Real Parties in Interest<br>Jose Roberto Lainez et al.: | Karasik Law Firm<br>Gregory N. Karasik<br><br>Law Offices of Santos Gomez<br>Santos V. Gomez<br>Maria Esmeralda Vissuzi |
| Amici Curiae on Behalf of Petitioner: | Grower-Shipper Association of<br>Central California<br>James Bogart<br><br>Western Growers Association<br>Jason Resnick<br><br>California Farm Bureau Federation<br>Carl Borden<br><br>Ventura County Agricultural Association<br>Robert Roy<br><br>Tanimura & Antle Fresh Foods, Inc.<br>Carmen A. Ponce<br><br>Arnold & Porter Kaye Scholer LLP<br>Martin R. Glick<br>Christopher T. Scanlan<br><br>Nunes Cooling, Inc<br>Brett R. Harrell |

*Jackpot Harvesting Co., Inc. v. Superior Court*
**H044764**